492 So.2d 1193 (1986)
Marie Louise Bonner BERGERON
v.
Burke Anthony BERGERON, Jr.
No. 85-C-1936.
Supreme Court of Louisiana.
August 19, 1986.
Rehearing Denied September 11, 1986.
Elliot G. Snellings, Drury & Tabb, New Orleans, La., for plaintiff-applicant.
Robert B. Clarke, Metairie, for defendant-respondent.
DENNIS, Justice.
The issue presented in this suit to modify a child custody judgment is whether the moving party, in order to obtain a change in the prior custody decree, must show that a change in circumstances has occurred *1194 which materially affects the child's well being. The trial court concluded that no such showing was necessary and, stating that the child's best interests so required, proceeded to vacate the mother's longstanding sole custody award and to substitute a joint custody order giving the father physical custody nine months of each year. The court of appeal affirmed. We reverse. Although the trial court retains a continuing power to modify a child custody order, there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a significant change in the custody order. None of the events proved by the father, viz., his improper retention of the child in violation of the custody order, and the mother's divorce, remarriage and custody of her two children by her second marriage, in and of itself without additional evidence of effects upon the child, constitutes a change in circumstances warranting consideration of a change in the custody decree.
The petitioner, Burke Anthony Bergeron, Jr., and the respondent, Marie Bergeron McLee, were divorced in 1978. In the divorce judgment McLee was awarded sole custody of their child, Terrence, who was then two years old. In 1979, 1980 and 1981, Bergeron prosecuted three unsuccessful actions to wrest custody from McLee. On August 8, 1984 Bergeron filed this, his fourth petition, to change the custody of the child to himself. After a hearing, the trial court on September 17, 1984 set aside the original sole custody decree, entered a joint custody decree, awarded Bergeron, as primary custodian, physical custody nine months each year, and relegated McLee to three months physical custody per year. On appeal by McLee, the court of appeal affirmed, 474 So.2d 1014 (La.App. 5 Cir.1985), and we granted certiorari. 478 So.2d 136 (1985).
The parties were married in 1968 and resided in Jefferson Parish before their divorce in 1978. Terrence was the only child born of their marriage. McLee remarried, divorced her second spouse and married a third spouse before this litigation. After her second divorce, McLee moved to Shreveport where she practices dentistry and resides with her third husband, two daughters by her second marriage, and, before this litigation, Terrence. McLee's third husband is in the process of adopting her two daughters with the consent of her second husband. Bergeron has been married four times. He was married and divorced once before his marriage to McLee. After his divorce from McLee, he remarried, divorced his third spouse and married again. Bergeron continues to reside in Jefferson Parish with his fourth wife.[1] The record designated for this court's review does not contain any evidence as to Bergeron's present occupation, financial stability, home environment, other children and dependents, or his general fitness as a custodian.
This litigation over the custody of the unfortunate child arose because his mother allowed him to remain with his father after a 1983 Christmas visit and to attend school in Jefferson Parish during the spring of 1984. The reason for this temporary relinquishment of the child was disputed. The mother testified that the father improperly retained the child after the holiday visit and that she did not bring legal proceedings because the previous continual litigation had been distressing to Terrence. The father testified that the mother telephoned during the Christmas holiday and asked him to keep the child permanently. The trial court did not attempt to resolve the conflict in testimony but proceeded directly to a determination of which parent should have primary custody. We do not believe the mother intended to surrender custody permanently. All of her actions before and after this event convince us that she never *1195 wavered in her desire to remain the primary custodian of her son.
On June 2, 1984 Terrence returned to his mother's home in Shreveport. During July, 1984, McLee informed Bergeron by phone of her intentions to retain permanent custody of Terrence in Shreveport. Without McLee's knowledge, her husband arranged with Bergeron to send Terrence to Jefferson Parish for a one week visit with Bergeron in early August, 1984. When McLee learned of the planned visit, she protested but her husband either had already sent Terrence or he felt obligated to follow through with the visit he had agreed upon with Bergeron. On August 8, 1984, after Terrence arrived in Jefferson Parish, Bergeron filed the present suit to substitute himself as sole custodian of the child. Bergeron's testimony that McLee intended for him to retain permanent custody of Terrence is not credible for several reasons: he admitted that McLee told him in July, 1984 that she intended to continue as sole custodian under the court order; his testimony to a later communication with McLee is sketchy and unconvincing; his own petition acknowledged that he unlawfully retained the child over the objections of McLee, the legal custodian, while he sought to change custody to himself.
In his petition to substitute himself as sole custodian, Bergeron alleged that several changes in circumstances had occurred since the last court order respecting custody. The trial court apparently did not consider that a showing of a change in circumstances is a prerequisite to a modification of a child custody decree. Bergeron argues in this court that many of our jurisprudential precepts, such as the change of circumstances rule, have been legislatively abrogated. Before we inquire into what Bergeron alleged and proved, therefore, we must determine whether our change of circumstances rule is still valid.

1. The 1977 Amendment of Civil Code Article 157
Traditionally, to support an action for modification of a judgment of child custody, the plaintiff has been required to show that a change in circumstances materially affecting the welfare of the child has occurred since the prior order respecting custody. Estes v. Estes, 261 La. 20, 258 So.2d 857 (1972); Tiffee v. Tiffee, 254 La. 382, 223 So.2d 840 (1969); Decker v. Landry, 227 La. 603, 80 So.2d 91 (1955); Pepiton v. Pepiton, 222 La. 784, 64 So.2d 3 (1953); Guillory v. Guillory, 221 La. 374, 59 So.2d 424 (1952); State ex rel Divens v. Johnson, 207 La. 23, 20 So.2d 412 (1944); Higginbotham v. Lofton, 183 La. 489, 164 So. 255 (1935); Tate v. Tate, 169 La. 862, 126 So. 218 (1930); Pullen v. Pullen, 161 La. 721, 109 So. 400 (1926); Walker v. Myers, 150 La. 986, 91 So. 427 (1922); State ex rel Bush v. Trahan, 125 La. 312, 51 So. 216 (1910); Lemunier v. McCearly, 37 La.Ann. 133 (1885). The reasons for the rule are that it is desirable that there be an end of litigation and undesirable to change the child's established mode of living except for imperative reasons. Estes v. Estes, 261 La. 20, 258 So.2d 857 (1972); Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971); Speelman v. Superior Court of Santa Clara Cty., 152 Cal.App.3d 124, 199 Cal. Rptr. 784 (1983). See Turner v. Turner, 445 So.2d 35 (La.1984); Bordelon v. Bordelon, 390 So.2d 1325 (La.1980). Moreover, to require a party to show a change in circumstances materially affecting the child's welfare before contesting an award of custody, that he previously has had a full and fair opportunity to litigate, protects his adversary and the child from the vexation and expense attending multiple unjustified lawsuits, conserves judicial resources, and fosters reliance on judicial actions by minimizing the possibility of inconsistent decisions. See Turner v. Turner, 455 So.2d 1374 (La.1984); Johnston v. McCullough, 410 So.2d 1105 (La.1982); Bordelon v. Bordelon, 390 So.2d 1325 (La. 1980); Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971); Estes v. Estes, 261 La. 20, 258 So.2d 857, 860 (1972) (Barham, J., dissenting). Cf. Montana v. U.S., 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).
The change of circumstances rule is a jurisprudential precept developed by the *1196 courts in the absence of any legislated procedural law specifically governing child custody modification suits. During most of this century Civil Code Article 157, which governed the original award of permanent child custody, in pertinent part, provided only that "[i]n all cases of separation and of divorce the children shall be placed under the care of the party who shall have obtained the separation or divorce unless the judge shall, for the greater advantage of the children, order that some or all of them shall be entrusted to the care of the other party."
In interpreting and applying Article 157, in cases involving both the initial granting of custody and the modification of custody decrees, the courts developed several jurisprudential precepts: (1) The best interest of the children principle (the paramount consideration in determining to whom custody should be granted is always the welfare of the children); (2) The maternal preference rule (generally, it is in the best interests of the children to grant custody to the mother, unless she is morally unfit or otherwise unsuitable); (3) The change of circumstances rule (discussed above); (4) The heavy burden of proof for modification of custody rule (when the trial court has made a considered decree of permanent custody, the party seeking the change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the children as to justify removing them from the environment to which they are accustomed); (5) The appellate review standard (upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse.) Estes v. Estes, supra, and jurisprudence therein cited; Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971) and jurisprudence therein cited.
The best interest principle recognizes the child's substantive right to the custodianship that best promotes his welfare. The other precepts are auxiliary evidence and procedure rules drawn from judicial experience for the purpose of enforcing and protecting the child's substantive right. Thus, the maternal preference rule was formulated to aid the court in selecting the best custodianship, the change of circumstances and heavy burden of proof rules protect the best custodianship from improper or unnecessary relitigation after its establishment, and appellate deferrence preserves the trial court's determination of the child's best interest, except in the case of an abuse of discretion. Each of these auxiliary evidence and procedure rules is intimately connected with the substantive best interest of the child principle and has a strong effect on the substantive-procedural balance in child custody cases.[2]
After these judicial precepts had become well settled, the legislature in 1977 amended and reenacted Civil Code Article 157 to establish the best interest principle by law and to expressly reject the maternal preference presumption. Article 157 was amended by Act No. 448 of 1977 to read, in pertinent part, as follows:
"A. In all cases of separation and divorce, permanent custody of the child or children shall be granted to the husband or the wife, in accordance with the best interest of the child or children ..."
The legislative aim of this act seems clearsimply to codify the jurisprudential best interest principle and to reject statutorily the jurisprudential maternal preference *1197 presumption. Nevertheless, recent decisions of this court have failed to produce a consistent and satisfactory analysis of the legislative intention.
This court in Bordelon v. Bordelon, 390 So.2d 1325 (La.1980) declared that the legislature by the 1977 act adopted the best interest principle and rejected not only the maternal preference presumption but also the heavy burden of proof required to change custody. The court's rationale was that because the act adopted the jurisprudential best interest principle as the substantive criterion for granting and changing custody, the lawmakers must have intended to reject all other jurisprudential precepts having a material influence upon the application of the substantive principle. The court reasoned that because the heavy burden of proof requirement for changing custody limited the application of the best interest principle, it therefore had been rejected tacitly by the act. The Bordelon opinion did not make clear whether the change of circumstances rule and the appellate review standard, both of which may be said to strongly influence application of the best interest principle, are also considered to have been rejected. The opinion does not mention the change of circumstances rule, and its treatment of the appellate review standard is equivocal.[3]
Subsequently, this court in Turner v. Turner, 455 So.2d 1374 (La.1984), as part of a discussion of access to courts for the purpose of modifying a child custody decree, declared that "[t]he important thing is not to abuse the children by dragging them constantly through the court system, when there has not been a real change in circumstances sufficient to justify a change in custody." Id. p. 1381. Whether this represented a reaffirmation of the change of circumstances rule or the heavy burden of proof in custody modification cases was not made clear, however.
Upon reexamination of the 1977 act amending Civil Code article 157 and our recent decisions we conclude that the Legislature did not intend to abrogate the change of circumstances rule, the heavy burden rule or the appellate review standard. The Bordelon court was correct in concluding that the act codified the best interest of the child principle as the principal substantive criterion for granting and changing custody. The court's conclusion that the Legislature intended to forbid courts to apply the heavy burden of proof rule, however, was based on a faulty premise, i.e., that when the Legislature codifies a substantive jurisprudential principle it intends, in the absence of an express reservation, to make inoperative all subsidiary jurisprudential rules which materially influence its application. It is more likely that the legislative approval and codification of a broad, general jurisprudential principle carries with it approval of, or acquiescence in, contemporaneously developed auxiliary rules used by the courts to implement the principle, unless there is a contrary provision.
Modern civilian method often calls upon the courts to develop jurisprudential precepts and techniques in the implementation of legislated law. In the promulgation or revision of a civil code the texts of earlier written laws, as well as custom and judicial expressions are merged, together with new policies, into the formal written text which constitutes a new point of departure for subsequent interpretation and development. It is in the nature of codified law to be in the form of general rules and principles rather than specific solutions for individual fact situations.[4] Accordingly, the *1198 courts which administer justice in a system of written law must do more than mechanically apply the law. These courts have the duty to interpret the written law and to fix the meaning of terms in their proper context, to determine the applicability of the articles to new fact situations, to make extensions by analogy in appropriate civilian fashion, and to solve new problems in a manner consistent with existing laws. In doing so, the court supplements the general principles outlined in the written law and, to the extent that such decisions are accepted as good, the court establishes relational patterns by which the conduct, rights and duties of people are governed. J. Dainow, "The Louisiana Civil Law", Dainow, Civil Code of Louisiana, (West Pub. 1947) pp. xi-xxxviii.
As Portalis, the leading jurist who contributed to drafting the French Civil Code, remarked in his Preliminary Discourse to the French National Assembly in 1800, as he described the relationship between the legislator and the judge in a codified system of law:
The role of legislation is to set, by taking a broad approach, the general propositions of the law, to establish principles which will be fertile in application, and not to get down to the details of questions which may arise in particular instances.
It is for the judge and the jurist, imbued with the general spirit of the laws, to direct their application.
Hence, in all civilized nations, we always witness the formation, alongside the temple of enacted laws and under the legislator's supervision, of a repository of maxims, decisions, and doctrinal writings which is daily refined by the practitioners and their clashing debates in court, which steadily grows as all acquired knowledge is added to it, and which has always been regarded as the true supplement of legislation.
* * * * * *
There is a science for lawmakers, as there is for judges; and the former does not resemble the latter. The legislator's science consists in finding in each subject the principles most favorable to the common good; the judge's science is to put these principles into effect, to diversify them, and to extend them, by means of wise and reasoned application, to private causes; to examine closely the spirit of the law when the letter kills; and not to expose himself to the risk of being alternately slave and rebel, and of disobeying because of a servile mentality.
The legislator must pay attention to case law; it can enlighten him, and he can correct it; but there must be a body of case law. In the host of subjects that make up civil matters, the judgments of which, in most cases, require less an application of a precise provision than a combination of several provisions leading to the decision rather than containing it, one cannot dispense with case law any more than he can dispense with legislation. It is to judicial decision that we surrender the rare and extraordinary cases incapable of fitting into a mold of rational legislation, the details so varied and so much disputed that they should not concern the lawmaker at all, and all the issues that one would try vainly to anticipate or that a hasty prediction could not safely provide for. It is for experience gradually to fill up the gaps we leave. The Codes of nations are the fruit of the passage of time; but properly speaking, we do not make them.
A. Levasseur, Code Napoleon or Code Portalis?, 43 Tul.L.Rev. 762, 769-73 (1969) (Translation by M. Shael Herman).
In a civilian system, especially amidst the extraordinary development of contemporary legislative action, the highest court has the mission of guarding and regulating the unity and regularity of the interpretation of law. It is an old, unsettled question whether the precepts developed by courts *1199 to implement codified law constitute any kind of law themselves. Nevertheless, decisional precepts, without being in themselves a formal source of positive law, should have considerable authority possessing great force in the mind of the lawyer or interpreter, especially when they form a constant stream of uniform and homogeneous rulings having the same meaning. See Geny, Methode d'Interpretation Et Sources En Droit Prive Positif Nos. 146-49, 177.
Consequently, we conclude that the 1977 revision of Civil Code article 157 adopted the jurisprudential principle that a child's custody shall be decided according to his best interest without disturbing the authority or continued development of this Court's gender neutral interpretive and implemental precepts. There is nothing in the legislation to indicate a departure from traditional civilian technique. The lawmakers merged the jurisprudential best interest principle together with a new policy of gender neutrality into the code. They adopted the principle as part of the code and left the tasks of interpretation and implementation largely to the courts. The legislators' awareness of the considerable authority and value of the precepts in guarding and regulating the unity and regularity of the law and their intention to leave these precepts substantially undisturbed are confirmed by the statute's careful excision of only the maternal preference precept, which was necessitated by the new policy of gender neutrality.
To reach a different conclusion would be to follow the common law tendency to restrict the field of application of a statute as much as possible, rather than the traditional civil law doctrine of implementing the law by interpretation and analogy. See K. Zweigert and H. Puttfarken, Statutory Interpretation-Civilian Style, 44 Tul.L.Rev. 704, 705 (1970); S. Herman and D. Hoskins, Perspectives on Code Structure: Historical Experience, Modern Formats, and Policy Considerations, 54 Tul.L.Rev. 987, 1033 (1980). In response, the legislator, to avoid emasculating principles borrowed from the jurisprudence by disregarding their history and destroying relevant decisional precepts, would be required to clutter the code with saving clauses, thereby abandoning the effort to maintain a code of principles. There is nothing in the 1977 revision of Article 157 to indicate such a legislative aim to undermine the civilian process.
The Bordelon opinion, on the other hand points up the need for this court to reconsider whether the heavy burden of proof rule in modification cases should be continued. That rule provides that when a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the children as to justify removing them from the environment to which they are accustomed. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971).
A heavy burden of proof in custody modification cases is justified for several reasons. In the usual civil case a mistaken judgment for the plaintiff is no worse than a mistaken judgment for the defendant. However, this is not the case in an action to change a permanent award of custody. The available empirical research data and psychiatric opinions indicate a need for strict standards that set clear boundaries for modification actions. There is evidence that more harm is done to children by custody litigation, custody changes, and interparental conflict, than by such factors as the custodial parent's post divorce amours, remarriage, and residential changes, which more often precipitate custody battles under liberal custody modification rules than conduct that is obviously harmful to the child, such as abuse or serious neglect, which justifies intervention to protect the child under the court's civil or juvenile jurisdiction. Wexler, Rethinking the Modification of Child Custody Decrees, 94 Yale L.J. 757, 774-75, 782-84, 785-802 (1985); Foster, Adoption and Child Custody: Best Interests of the Child?, 22 Buffalo L.Rev. 1, 12-13 (1972); Watson, The Children of Armageddon: Problems of Custody Following Divorce, 21 Syracuse L.Rev. 55, 63-64, 76-77 (1969); Bodenheimer, *1200 The Rights of Children and the Crisis in Custody Litigation: Modification of Custody In and Out of State, 46 Uni.Colo.L.Rev. 495, 498-99 (1975); Bodenheimer, The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws, 22 Vand.L.Rev. 1207, 1208-09 (1969). See Fulco v. Fulco, 259 La. 1122, 254 So.2d 603, 605 n. 1 (1971); Estes v. Estes, 261 La. 20, 258 So.2d 857, 860 (1972) (Barham, J., dissenting).
The heavy burden of proof rule as presently formulated may inflexibly prevent a modification of custody that is in the child's best interest in a narrow class of cases, however, by requiring that a showing that the present custody is deleterious to the child as an indispensible ground for modification. In some instances the benefits to the child from a modification of custody may be so great that they clearly and substantially outweigh any harm that will be likely to result from the change even though the present custody is not deleterious to the child.[5]
The child has at stake an interest of transcending value in a custody modification suithis best interest and welfare which may be irreparably damaged not only by a mistaken change in custody but also by the effects of an attempted or threatened change of custody on grounds that are less than imperative. The consequences to the mental and emotional well being and future development of the child from an erroneous judgment, unjustified litigation, threat of litigation, or continued interparental conflict are usually more serious than similar consequences in an ordinary civil case. On the other hand, we are convinced that in a narrow class of cases a modification of custody may be in the child's best interest even though the moving party is unable to show that the present custody is deleterious to the child. However, in order to protect children from the detrimental effects of too liberal standards in custody change cases, the burden of proof should be heavy and the showing of overall or net benefit to the child must be clear. To accommodate these interests, the burden of proof rule should be restated as follows: When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. See Bankston v. Bankston, 355 So.2d 58 (La.App. 2d Cir.1978); Languirand v. Languirand, 350 So.2d 973 (La. App. 2d Cir.1977). Cf. Unif. Marriage and Divorce Act, 9A U.L.A. § 409 (1979). Accordingly, we will apply this rule to custody modification cases tried after finality of the judgment herein.

2. The Joint Custody Law of 1982
Bergeron argues that even if our jurisprudential rules survived the 1977 amendment of Civil Code article 157, they were repealed by the Joint Custody Law, 1982 La. Acts, No. 307, which amended Civil Code Articles 146, 157, and 250 and La.C. C.P. art. 4262. We find no evidence that this law abrogated the change of circumstances requirement, the burden of proof rule or the appellate review standard.
Civil Code article 157, as amended in 1982, provides for the permanent custody of children: In all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the parents in accordance with Article 146.
*1201 Civil Code article 146, as amended in 1982, provides for the provisional custody of children during litigation: First, and of paramount importance, provisional custody shall be awarded according to the best interest of the children. Second, an order of preference as to whom custody shall be awarded is established: (1) to both parents jointly (plans of implementation may be submitted by the parties and shall be required by the court unless waived for good cause); (2) to either parent (sole custody); (3) to the person in whose home the child has been living satisfactorily; (4) to any other suitable person. Third, there is a presumption that joint custody is in the best interest of the child which may be rebutted by a showing to the contrary, after considering evidence introduced with respect to numerous factors including each parent's tie of affection with the child, each parent's capacity to love, guide and educate, each parent's capacity to support, the child's length of residence in a stable environment, the permanence of the existing and proposed homes, each party's moral fitness, each party's mental and physical health, the child's home, school and community record, the child's preference, each parent's capacity to preserve the child's relationship with the other parent, the distance between residences, and any other relevant factor. Fourth, a joint custody order may be modified or terminated when it is shown that the best interest of the child so requires, and the court must state the reasons for the change if it is opposed by either parent. Fifth, a non-joint custody order may be modified at any time to a joint custody order in accordance with the provisions of the Article.[6]
Thus, Article 146 contemplates that the court shall select from among the litigants' proposed provisional custody plans that provisional plan which most effectively promotes the best interest of the child. This requires the court to compare the advantages and disadvantages of each concrete plan in terms of its effect upon the child's welfare. If the court finds that the evidence preponderates in favor of a particular custody plan as being most effective in promoting the child's best interest the court must adopt that plan, regardless of whether the plan calls for joint or sole custody. The presumption or preference in favor of a joint custody plan only comes into play and requires the court to adopt the joint plan when the evidence is in equipoise, that is when the court is in doubt as to whether the joint plan is superior to a competing non-joint plan in terms of promoting the child's best interest. Turner v. Turner, 455 So.2d 1374 (La.1984).
The best interest of the child is the sole criterion to be met in awarding or modifying custody under Civil Code article 146. Custody must be awarded according to the best interest of the child. Id. Civil Code art. 146 A. The principle is repeated throughout article 146. Id. Civil Code art. 146(A), (A)(2), (B), (C), (E). Turner v. Turner, supra p. 1378.
For the reasons given in our discussion of the 1977 revision of Civil Code article 157, we conclude that when the Legislature in the 1982 Joint Custody Law reaffirmed the best interest of the child as the paramount principle of child custody law without expressing any disapproval of the gender neutral auxiliary precepts developed by this court for implementation of the principle, it tacitly recognized their continued authority as decisional precepts. Under our civilian technique, when the Legislature codifies a judicial principle having a long history of decisional interpretation it is probable that the lawmakers were aware of the jurisprudential precepts when they adopted the principle and chose not to disturb or modify them in the absence of an expression or indication to the contrary.
The factors set forth by Article 146(C)(2) for the court to consider in determining whether the presumption in favor of joint custody has been rebutted by a showing *1202 that it is not in the best interest of the child do not conflict with or indicate disapproval of the change of circumstances rule, the heavy burden of proof rule or the appellate review standard. These factors, like the presumption itself, do not come into play unless the evidence is in equipoise as to whether a joint custody plan or a competing plan more effectively serves the best interest of the child. Also, the list of factors is a very general non-exclusive enumeration of some of the things to be considered in order to prevent a mistake in deciding whether it is better for the child to have one or two parental custodians, initially and provisionally. Its failure to articulate and focus specifically on the different and more pernicious threats to children's welfare associated with permanent custody change litigation does not indicate an intention that the courts should disregard those dangers. Furthermore, the checklist authorizes the court to take cognizance of "[a]ny other factor considered by the court to be relevant to a particular child custody dispute." Civil Code art. 146(C)(2)(l). In the change of custody context, there is more at stake than simply selecting the best of the initial custodianships proposed. The harm which may result from disrupting the child's established mode of living and the injury that may result from the encouragement of unjustified litigation and continued parental conflict are other factors which are relevant in custody change cases.
We are in agreement with the two jurisdictions we have found that considered similar questions under joint custody statute provisions identical to ours. In Speelman v. Superior Court of Santa Clara Cty., 152 Cal.App.3d 124, 199 Cal.Rptr. 784 (Cal. App. 1st Dist.1983) the court held that there was no evidence that the child custody law abrogated the "change of circumstances" requirement reiterated and explained by the California Supreme Court in In re Marriage of Carney, 24 Cal.3d 725, 157 Cal.Rptr. 383, 598 P.2d 36 (1979). The only change in the law made by the joint custody law, the court held, were changes which facilitated joint custody, implementing a public policy in favor of assuring frequent and continuing contact with both parents and sharing the rights and responsibilities of the child rearing; they did not purport to alter the public goals of ending litigation and minimizing changes in the child's established mode of living or to define the best interests of the child. Id. p. 788, 157 Cal.Rptr. 383, 598 P.2d 36. Moreover, the California court concluded that its provision corresponding to La.Civil Code art. 146(E) implicitly adopts the "change of circumstances" requirement:
... by requiring that the court state its reasons for modifying or terminating joint custody if the motion is opposed. It is inconsistent to find both the initial placement and the change of custody to be in the child's best interests if the circumstances have remained the same throughout. The requirement of a statement of reasons for the change forces the trial court to articulate how circumstances have changed since the initial decision. Id.

The Superior Court of Pennsylvania in Karis v. Karis, 510 A.2d 804 (1986) held that under the Pennsylvania joint custody law a substantial change of circumstances must be shown when a party petitions for modifications of partial custody, just as he must before a total change of custody may be considered, to avoid the uncertainty and instability that a best interest test alone would provide. The court declared:
It is inconceivable to us that the Legislature intended to allow a party to petition for modification of custody without showing substantial changed circumstances since the prior order, simply by pleading the magic words "shared custody". Such a situation would spawn multiple, spurious petitions based on temporary or vacillating circumstances, or frequent relitigation of issues already resolved.... We interpret section 1011 of the Act to simply mean that the option of shared custody, under the proper circumstances is always available to the court, no matter what the preexisting order was. But the petitioner must still prove *1203 as in any custody modification request, a substantial change in circumstances before the court can consider the petition.
Id. p. 808-809.
Accordingly, as we construe both Sections E and F of Article 146, in light of the entire statute and the history of this legislation, the option of joint custody is always available if it is in the best interests of the child, but because the best interest of the child principle was adopted from the jurisprudence without any intention of disturbing the gender neutral decisional precepts or the courts' freedom within the civilian tradition to interpret and implement the principle, the change of circumstances rule, the heavy burden rule, and the appellate review standard apply to any petition to modify custody, regardless of whether it is joint or sole custody.

3. Application of the Change of Circumstances Rule to This Case
Of the changes in circumstances alleged by Bergeron, he has shown only that Mrs. McLee was divorced from her second husband and obtained custody of her two children by that marriage in 1982; that she married Mr. McLee in January of 1984; and that Bergeron had actual custody of the child at the time of the hearing on September 4, 1984, after his improper retentions of him in December, 1983 and August 1984, and since then except for June and July of 1984.
The record does not contain any information as to how these changes may have affected the child's welfare. The changes in and of themselves are not so serious that we may infer that they materially affected the child's welfare without further evidence.
If the best interests of all children are to be served, the improper removal of a child from physical custody and improper retention of a child after a visit or other temporary relinquishment must be deterred. This principle has received statutory recognition with enactment of the Uniform Child Custody Jurisdiction Act, La.R.S. 13:1707 (West 1983).
The imperative to discourage abduction and other violations of custody orders may, in extraordinary circumstances, be submerged to the paramount concern in all custody matters for the welfare of the child. See Nehra v. Uhlar, 43 N.Y.2d 242, 401 N.Y.S.2d 168, 372 N.E.2d 4 (1977). However, even if Bergeron has had physical custody of the child for two years since the second improper rentention in August, 1984, this is not in and of itself a change in circumstances sufficiently extraordinary to justify upsetting the original custody decree. If it were, a parent having lost a custody dispute might believe that by abducting or improperly retaining a child and waiting for time to pass, the prior decree could be effectively nullified. Id.
Although not alleged by Bergeron in his petition, the trial court alluded to the child's expression of his preference to have his custody transferred to his father. A child's preference, in and of itself, with no explanatory evidence, as in the present case, is not a material change of circumstances affecting the child's welfare. Pierce v. Pierce, 213 La. 475, 35 So.2d 22 (1948); Cenac v. Power, 211 So.2d 408 (La. App. 1st Cir.1968). Denigrated in rank, to some degree, should also be the natural or manipulated "satisfaction" of abducted or improperly retained young children with the homes where they presently reside. See Nehra v. Uhlar, supra, 401 N.Y.S.2d at p. 173, 372 N.E.2d at p. 9.
Accordingly, the judgments of the court of appeal and the trial court are reversed and set aside and the original custody decree is reinstated. All costs are charged to respondent Bergeron.
REVERSED.
BLANCHE,[*] J., concurs with reasons to be assigned.
NOTES
[1] Although the evidence is ambivalent as to whether Bergeron has been married three or four times, there is a judgment of divorce, other documentary evidence, and other evidence in the record indicating that he has been married to Steve Ann Bloom, Marie Bonner McLee, Donna Marie Golden, and is presently married to Jan Lobue.
[2] One of the three well recognized classes of evidence rules consists of "those intimately connected with special substantive rules having a strong effect on the substantive-procedural balance in a narrow class of cases." Weinstein, The Uniformity-Conformity Dilemma Facing Draftsmen of Federal Rules of Evidence, 69 Colum.L.Rev. 353, 361 (1969). Presumptions and burdens of proof do affect substantive rights and are a part of this class, but the mere fact that they have a substantive effect does not prevent them from being classified as rules of evidence or procedure. The other two classes of evidentiary rules are truth determining rules and rules protecting extrinsic policy. Id. 361-63. See also Degnan, The Law of Federal Evidence Reform, 76 Harv.L.Rev. 275 (1962). Wellborn, the Federal Rules of Evidence and the Application of State Law in the Federal Courts, 55 Tex.L.Rev. 371 (1977).
[3] After rejecting the relator's argument that this court should undertake an unlimited de novo inquiry into the best interest of the child, the court indicated that the clearly wrong or manifest error standard is a proper standard of review in a child custody case, but concluded by applying the abuse of discretion standard in reviewing the trial court decision despite the fact that this standard limits the application of the best interest principle by the appellate courts.
[4] "[P]rinciples do not attach any definite detailed legal results to any definite, detailed states of fact.... [They] are authoritative starting points for legal reasoning, employed continually and legitimately where cases are not covered or are not fully ... covered by rules in the narrower sense." R. Pound, Hierarchy of Sources and Forms in Different Systems of Law, 7 Tul.L.Rev. 475, 482-87 (1933).
[5] The failure to recognize such a ground for modification is the probable reason for the continual difficulty our courts have experienced in applying the heavy burden of proof rule. See, e.g., Bankston v. Bankston, 355 So.2d 58 (La. App. 2d Cir.1978); Languirand v. Languirand, 350 So.2d 973 (La.App. 2d Cir.1977); Bushnell v. Bushnell, 348 So.2d 1315 (La.App. 3d Cir.1977); Craft v. Craft, 184 So.2d 758, 760 (La.App. 3d Cir.1966); Wells v. Wells, 180 So.2d 580, (La. App. 3d Cir.1965); Gary v. Gary, 143 So.2d 411 (La.App. 3d Cir.1962). See generally, Note, 38 La.L.Rev. 1096, 1102-08 (1978); Comment, 27 Loy.L.Rev. 1099, 1106, 1123-1128 (1981).
[6] Civil Code article 146 also contains provisions for access to records, mediation, mental health examinations, chamber hearings, and the ingredients of joint custody orders. Id. par. (D), (G)-(J).
[*] Blanche, J., retired, participated in this case ad hoc, in place of Cole, J., the matter having been heard and submitted before Justice Cole replaced Justice Blanche on the Court.