GOTHARD, Judge.
Defendant, Wiltz Matherne, appeals a judgment from the trial court making exec-utory past due child support in the amount of $2,450.00, denying defendant’s request for a decrease in child support and making special custody provisions for one of the couple’s four minor children. Mrs. Math-erne has answered the appeal requesting an increase in child support. The judgment rendered, in the trial court is silent on the disposition of that issue. It appears from the record that consideration of that matter in view of the recently enacted guidelines is ongoing in the trial court and has yet to be decided. Consequently, that issue is not properly before us for review.
This matter began with a petition for separation filed by the wife on February 28, 1986. Since that time several judgments concerning child support and custody of the couple’s four minor children have been rendered. The most recent judgment prior to the judgment in question is a consent judgment of divorce entered into by the parties on July 21, 1987. That judgment ordered Wiltz Matherne to pay $600.00 per month child support with a reduction to $300.00 per month for the summer months should Mr. Matherne exercise his right to physical custody of the children during those months. Additionally, joint custody was granted with the following stipulation:
“The parents shall have equal authority over the up-bringing, education and discipline of the children. Each parent shall have equal rights and access to any and all matters affecting the children. Both parents shall have an equal voice in rearing the children and participating in decision making regarding health, education, social and religious development of the children.”
Mr. Matherne left the state in search of employment opportunities in September, 1987 and eventually settled in New Hampshire. He did not exercise his right to summer custody and is not entitled to a reduction of child support pursuant to the judgment. Mr. Matherne fell behind in his support obligation forcing Mrs. Matherne to turn to the state for assistance. During the period from April, 1988 to the hearing date the State of Louisiana, through the Department of Health and Human Resources collected the entire amount of child support due by Mr. Matherne.
Physical custody of the couple’s four minor children remained with Mrs. Matherne, who still lives in Louisiana. One of the children, Seth age 10, is a Down’s Syndrome child. In September, 1987 shortly *939 after Mr. Matherne left the state, Mrs. Matherne obtained residential placement for Seth in Magnolia State School pursuant to a Federal grant. Mr. Matherne learned of the placement in December, 1987.
On May 24, 1989 Mr. Matherne filed a rule seeking custody of Seth and a decrease in child support should the rule for custody be granted. On June 14, 1989, Mrs. Matherne objected to Mr. Matherne’s rule and filed a rule to make past due child support executory, and for contempt, attorney’s fees and an increase in child support.
After a hearing on the rules conducted on September 8th and 9th, 1989, the trial court rendered a judgment making child support in the amount of $2,450.00 exec-utory, setting attorney’s fees at $500.00, denying a change in amount of child support and suspending the original contempt citation. Additionally, the judgment contained the following order of custody:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the original joint custody order is reinstated; however, insofar as at (sic) pertains to the minor, Seth Matherne, it is specifically ordered that both parties are to participate in his future welfare, provided that by court order this date, he is not to be removed from Magnolia School unless and until further rulings from this court are requested. The Magnolia School is hereby ordered to treat the father on a (sic) equal basis as the mother in reference to the minor, Seth Matherne.
Mr. Matherne appeals asserting two errors in the judgment, the amount of child support made executory and the custody order.

Child Support

Mrs. Matherne filed a rule for contempt on June 14, 1989 asserting that Mr. Matherne was $1,900.00 in arrears in child support payments. In order to carry her burden of proof on this rule, Mrs. Math-erne offered testimony of Joycelyn Acosta of DHHR, who testified that Mr. Matherne was current on payments due from April, 1988 to the date of trial. Mrs. Matherne did not testify. She called Mr. Matherne for cross-examination under the act. Mr. Matherne produced records of payment to rebut the accusation that he was behind in child support prior to the time the State took over collection of payments. Among these records were several blank money order stubs. During cross-examination the following transpired:
Q And what I’ve done and your attorney have done, .. we’ve matched up the checks and the money orders that you claim you paid Cindy. And we’ve put them in a schedule form. And is it not true that after those checks and money orders are matched up with the face amount of the checks and the face amount of the money orders, you still owe a balance of two thousand four hundred and fifty dollars ($2450.00)?
A If that’s the amount that was added up, I suppose. Yes sir.
MR. .GRIFFITH:
Q Are you claiming that you want credit for these money orders which have no date, no amount.
A These are my copies. The attached pieces are the money orders that were sent to Cindy.
After admission of the blank stubs Mr. Matherne testified as follows:
MR. GRIFFITH:
Q Not taking this into consideration, you admit, though, that your records reflect that you still owe a balance to her of two thousand four hundred and fifty dollars ($2450.00)?
A Well, with .. okay.
Q Is that correct?
A I suppose.
On direct examination Mr. Matherne’s counsel attempted to retract that admission:
THE COURT:
Well, I don’t understand it. He just testified he owes two thousand four hundred and fifty dollars ($2450.00).
MR. GRIFFITH:
Okay. I’ll withdraw .
THE COURT:
Didn’t he just say that?
MR. RICE:
If his assumption was correct.
*940 THE COURT:
What do you mean, “if his assumption is correct”?
MR. RICE:
His assumption .
THE COURT:
Oh, I’m not going to get into that.
MR. RICE:
Okay.
However, the court again questioned Mr. Matherne directly:
THE COURT:
Q Do you owe two thousand four hundred and fifty dollars ($2450.00)?
A I .. ah .. yes sir. I suppose.
Mr. Matherne argues on appeal that the judge misunderstood the testimony and would not allow the defendant-in-rule to fully explain his position. A careful reading reveals that the trial court allowed defendant ample opportunity to explain his answers. Even , after three admissions from the defendant that $2,450.00 was owed in child support payments the trial court, at defense counsel’s urging, asked the defendant for a fourth time:
QUESTIONS BY THE COURT:
Q Why didn’t you pay your child support?
A I did pay it, your Honor.
Q You said you owed ... why did you say you owed ...
A No sir.
Q ... twenty four fifty ($2450.00)?
A According to the records prior to showing my blank stubs, that’s what it looks like....
Q What did you mean when Mr. Griffith asked you that you owed two thousand four hundred and fifty dollars ($2450.00)? When you said “yes”? What did you mean?
A I mean .. that the stubs that he shown on that separate sheet of paper.
Q Okay. Thank you.
MR. RICE:
Your Honor? Mr. Griffith .
THE COURT:
Okay. Sir.
MR. RICE:
.... asked him, “According to these records ...” and he only showed him part of ’em.
THE COURT:
Mr. Rice, I have my answer sir. Thank you.
MR. RICE:
Yes sir. I just want to make sure you understand my....
THE COURT:
Yes sir. I understand it.
MR. RICE:
Okay. Thank you, your Honor.
The trial court stated that it found from the evidence and the testimony Mr. Math-erne owed $2,450.00 in past due child support. It is clear that no credit was given for the blank money order stubs. We have reviewed the evidence and the testimony in this matter and _ do not find error in the trial court’s decision making Mr. Matherne liable for $2,450.00.

Custody

The father also appeals that portion of the judgment which relates to custody of Seth Matherne. As previously stated Seth has been a full time resident of the Magnolia State School since September, 1987. Mr. Matherne proposes that Seth be allowed to leave Magnolia and move to New Hampshire to reside with Mr. Matherne and his new family. Mr. Matherne seeks to maintain the joint custody consent judgment of July 21, 1987 with the exception that physical custody of Seth be granted to the father permanently.
The judgment of July 21, 1987 granted physical custody of all four of the children to the mother during the months of September through May and to the father during the months of June, July, and August for a maximum of 20 days per month.
In spite of that portion of the judgment granting an equal voice in the decision making process with regard to the children, the mother unilaterally placed Seth in Magnolia. Mrs. Matherne testified that she was unable to apprise Mr. Matherne of this since he was out of state and left no telephone number.. She admitted on cross-examination, however, that Mr. Matherne *941 called on occasion to speak to the children and that Mr. Matherne had local relatives who would be able to contact him. As a result actual physical custody of Seth is currently with Magnolia State School. Neither parent is currently exercising their right to custodial custody of Seth. The mother has relinquished hers to Magnolia and the father has simply failed to exercise his.
La.C.C. art. 157 states:
In all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the parents in accordance with Article 146.
Under La.C.C. art. 146 the best interest of the child is the paramount principle in awarding child custody. In Bergeron v. Bergeron, 492 So.2d 1193 (La.1986) the Supreme Court mandated that a party seeking the change bears a heavy burden which also includes proof that continuation of the present custody is so dileterious to the child as to justify the modification. The rationale behind the Bergeron decision is protection of the child from endless litigation over custody. In the instant case, unlike Bergeron, custody was not granted pursuant to a considered decree. The record does not reveal any evidence adduced concerning parental fitness. Thus, we conclude that the appropriate burden of proof is the best interest of the child with consideration of the factors enumerated in article 146. Bridgers v. Bridgers, 509 So.2d 793 (La.App. 1st Cir.1987).
In the instant case the trial court heard evidence from both parents and one expert. The mother testified that Seth began attending a day care program at Magnolia School during the summer of 1987. She explained that it was difficult for her to give Seth the constant attention he required because she was alone with four children. Mr. Matherne had just left the state and it was necessary for Mrs. Math-erne to secure employment outside of the home. Because of Seth’s special needs Mrs. Matherne was unable to find suitable day care.
There was some evidence of allegations of physical abuse made by the children against the mother’s former boyfriend. Mrs. Matherne testified that she has completely severed her relationship with that man and is now living with three of her children, ages four through thirteen, and her mother.
Mrs. Matherne explained that Seth is allowed forty-five days of outside visitation per year. Often Seth goes home on weekends and holidays. He is very close to his siblings, especially his four-year-old sister Laura. Mrs. Matherne describes Seth and Laura as “inseparable.”
The father testified that he left the state in September, 1987 to seek employment as a pipefitter. He stopped in several states, settling in New Hampshire in January, 1989. In August, 1989 he remarried and currently lives in New Hampshire with his new wife and her two teenage children. Mr. Matherne explained that, although he was unable to visit often during that transient period, he did call his children on a weekly basis. In spite of these frequent phone calls he did not learn of Seth’s placement in Magnolia until December, 1987. He testified that he returned to live in New Orleans from December, 1987 through June, 1988. He admitted on cross-examination that during those six months he did not seek to take Seth out of Magnolia and only visited him three or four times in the entire period from December, 1987 until the filing of the rule to change custody in May, 1989. He stated that he was unable to exercise his summer visitation in 1989 because of illness.
Mr. Matherne further stated that he now wishes to take Seth to New Hampshire to live with his new family. He testified that he has attended a seminar with Mrs. Math-erne on the care of Down’s Syndrome children and intends to mainstream Seth in the public school system.
Dr. Scuddy F. Fontenelle III, an expert in the field of adolescent psychology and a consultant to Magnolia School testified for the father. He testified that he counsels children at the school who have emotional problems. Although he did not counsel or *942 evaluate Seth personally, Dr. Fontenelle reviewed Seth’s psychological records. Dr. Fontenelle testified that he met with Seth for the first time the day before the hearing. As a result of that consultation Dr. Fontenelle opined:
“Seth continues to function within the lower limits of the moderate mentally handicapped range of intelligence as a function of Down’s Syndrome. The youngster also displays certain problematic behaviors of restless, impulsivity and hyperactivity. He is a child who shows deficits in his oral communication skills. He shows very poor judgment due to his impulsivity and hyperactive-like behavior. And he does not recognize dangerous or hazards in his day to day living.”
Dr. Fontenelle explained that a home environment which provides opportunity for interaction between a Down’s Syndrome child and his parents and siblings is preferable to an institutional setting. He stated that based on his conversations with the father a grant of custody to the father would be in the child’s best interest because Seth would be with people who have a genuine interest in him. But, Dr. Fonte-nelle cautioned that Seth will require constant supervision and represents a great obligation.
'When questioned further Dr. Fontenelle explained that evaluations of all parties would be helpful to determine what would be the optimum placement for Seth. The Doctor stated that although he had not conducted personality tests on either of the parents he decided “by clinical intuition” that it would be in the child’s best interest to live with the father. He opined that, since a family unit would be best for Seth, and testing is a time consuming activity, it would be in the child’s best interest to allow the child to live with his father in New Hampshire.
From the reasons for judgment it is apparent that the court found that either parent could provide a suitable home for Seth. The mother’s problems which existed when Seth was placed have lessened since she is now living with her mother and may be better able to care for Seth. The father, who has had a limited relationship with all four of his children now seems prepared to improve and strengthen those relationships.
The federal grant which maintains Seth at Magnolia provides $2,000.00 per month. Precipitous removal of the child from the school would cause a forfeiture of the grant. Should the father be unable to properly care for Seth it may be impossible to regain the lost placement in the future. The court had no assurance beyond the father’s testimony that he is fully prepared for accepting Seth into his home. Previously, the father has shown little interest in exercising his right to physical custody of Seth. We are also at a loss to explain his failure to seek visitation rights with regard to his other three minor children. Nonetheless, ample opportunity should be afforded the father to reestablish his relationship with all four of his children.
The nature of the placement precludes more than 45 days per year of visitation from Magnolia. In oral argument it was suggested that the father be allowed to take Seth to New Hampshire for half of that time or 22-½ days. The father countered this by raising the concern that 22-½ days may not be sufficient for Seth to make the adjustment so that a fair evaluation of permanent placement could be made.
We believe every effort must be made to place Seth in the home of one of his parents permanently as recommended by Dr. Fontenelle. There is simply not enough evidence contained in the record at this time to render a considered grant of permanent custody. Thus, we affirm the trial court’s denial of a change of custody and the temporary maintenance of this special needs child at Magnolia.
Since we are not empowered to intrude upon the trial court’s domain in the taking of evidence, we remand this matter to the trial court for clarification of the father’s visitation rights and for consideration of such issues as the need for evaluation of various family members as well as any other matters necesary to assure that Seth *943 will be placed in a situation which will provide optimum care in his best interest.
Accordingly, the judgment is affirmed as it relates to child support and temporary custody. The matter is remanded for clarification and further proceedings not inconsistent with this opinion.
AFFIRMED, BUT REMANDED FOR CLARIFICATION.